UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

JOSPEH A. HINKLE & JANE E.      )    No. CV-07-155-LRS
HINKLE, husband & wife, et al., )
                                )
                                )    **ORDER GRANTING**
              Plaintiffs,       )    **DEFENDANTS' MOTION**
                                )    **FOR SUMMARY JUDGMENT**
v.                              )
                                )
DAN LaROCHE, DOUGLAS            )
COUNTY SHERIFF, et al.,         )
                                )
                                )
              Defendants.       )
                                )

**BEFORE THE COURT** is the Defendants' Motion For Summary
Judgment (Ct. Rec. 38).  This motion was heard with oral argument on September
29, 2008.  James E. Davis, Esq., argued on behalf of Plaintiffs.  Michael A.
Patterson, Esq., argued on behalf of Defendants.

**I.  BACKGROUND**

       This is an action commenced by Joseph A. Hinkle and Jeffery A. Seal.
Federal subject matter jurisdiction arises because both individual assert claims
arising under 42 U.S.C. Section 1983.

       Hinkle, a former Douglas County sheriff's deputy, claims he was
improperly terminated from that position in retaliation for the exercise of his
constitutional rights.  Specifically, Hinkle says he was retaliated against for

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 1**

running against the incumbent Sheriff (Defendant Dan LaRoche) in the 2002 election. Hinkle claims that in October 2003, at the direction of Sheriff LaRoche, a criminal investigation was undertaken of Seal for the purpose of manufacturing grounds to terminate Hinkle. Seal is related to Hinkle through Hinkle's wife. At the request of LaRoche, the Washington State Patrol thereafter conducted an internal administrative investigation of Hinkle to determine if he had obstructed the criminal investigation by not giving honest answers to investigators. Based on the results of the administrative investigation, Sheriff LaRoche terminated Hinkle from his employment as a deputy sheriff.

In addition to claiming he was retaliated against for the exercise of his First Amendment rights, Hinkle asserts common law claims for abuse of process, outrage, intentional infliction of emotional distress, negligent infliction of emotional distress and defamation. He also asserts a claim for discrimination under the Washington Law Against Discrimination (WLAD), RCW 49.60.030, and for wrongful discharge in violation of public policy.

Seal asserts common law claims for police and prosecutorial misconduct, false arrest, malicious prosecution, negligence, fraud, abuse of process, outrage, intentional infliction of emotional distress, negligent infliction of emotional distress, and defamation. He also asserts violation of his Washington state constitutional rights under Article 1, Sections 3 and 7, and violations of his federal constitutional rights, specifically the Fourth, Ninth and Fourteenth Amendments.

Named as Defendants are Douglas County Sheriff Dan LaRoche, Douglas County Sheriff's Department, Douglas County, Douglas County Prosecuting Attorney Steven M. Clem, Douglas County Sheriff's Detective Stephen B. Groseclose, Douglas County Undersheriff David E. Wallace,, Douglas County Sheriff Chief Criminal Deputy Michael R. Wagg, Douglas County Sheriff Detective Sergeant David W. Helvey, and Douglas County Sheriff Sergeant

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 2**

Harvey O. Gjesdal.[1]

Defendants now move for summary judgment on all claims.

## II.  FACTS

The arbitrator's "Opinion And Award" regarding the labor grievance filed by Hinkle upon his termination contains an accurate time line of events which does not appear to be disputed by any of the parties.  The following time line is taken from the arbitrator's opinion (Ex. M to Mack Declaration, Ct. Rec. 42) and appears consistent with the respective statements of facts filed by the parties regarding the summary judgment motion.

Hinkle commenced his employment with the Douglas County Sheriff's department in 1990.  By letter dated April 27, 2005, Sheriff Dan LaRoche terminated Hinkle from his employment for misconduct and dishonesty.

The incident giving rise to the allegations against Hinkle involved an alleged vehicular homicide which occurred on the evening of October 17, 2003. The driver of the vehicle, Jeffery Seal, who was subsequently charged with vehicular homicide and acquitted, is related by marriage to Hinkle.

At 6:58 p.m. on October 17, 2003, the Sheriff's department received a 911 call alleging custodial interference.  The custodial interference incident occurred when a Randal McManus, the passenger in a truck driven by Seal, forcibly removed his daughter, Ariel Lee, from the Lee residence.  Seal had driven McManus to the residence for the purpose of retrieving the child.  While McManus was removing the child from the house, Seal remained in the truck. When McManus removed the child from the house, he was followed outside by Mary Linda Lee, the grandmother of the child, and Mary Linda Lee's son, Jeremy Lee.  The Lees ran out to the truck to prevent McManus from taking Ariel Lee.

---

[1]  These were their positions during the time relevant to this action.

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 3**

During the confrontation that ensued, Mary Linda Lee was struck by the truck and shortly thereafter, died of her injuries.

Hinkle and his wife had just returned from vacation on the evening of October 17, 2003, and Hinkle was scheduled to work the next day. On that evening, Hinkle called the Douglas County Sheriff's department dispatch and spoke to Dispatcher Molly Elliott at 7:25 p.m. Hinkle had called in for the purpose of requesting the next day off because of illness. The dispatcher informed Hinkle that "we had a custodial interference that turned into a female subject ran over by a truck and the subject left." Hinkle asked how long ago the incident had occurred and was informed that it had been between 15 and 20 minutes.

At approximately the same time the call was made from Hinkle to dispatch, there was an exchange of cell phone calls between Jeffery Seal and his sister, Jennifer Wiggs. Seal made a call to Wiggs at 7:24 p.m. that lasted approximately eight minutes. He described the custodial interference incident to his sister and asked whether he should contact law enforcement.[2] Subsequently, Wiggs made a call to the Hinkle household at 7:32 p.m. Hinkle's wife, Jane, has a brother, Joseph Wiggs, who is married to Jennifer Wiggs. During this call, Wiggs spoke to both Jane Hinkle and Joseph Hinkle. Wiggs then made a call to her brother at 7:44 p.m.

Seal was contacted at this parents' house (James and Sharon Seal) at 9:44 p.m. on October 17. He gave a statement to Detective Helvey at 10:35 p.m..

On October 18, 2003, the following day, Joseph Hinkle reported to work and accessed and reviewed the case file and reports describing the incident during which a truck driven by Seal had struck Mary Linda Lee during a custody dispute.

Detective Groseclose was assigned to conduct the criminal investigation of

---

[2] Apparently, however, he did not say there had been an accident in which he had struck someone with his vehicle.

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 4**

the October 17 incident.  At some point after the incident, he learned that Hinkle was related to Seal.  Groseclose interviewed Hinkle on November 13, 2003. Groseclose asked whether Hinkle or his wife had any telephone conversations with Seal on the evening of October 17 or thereafter.  Hinkle responded that there had been no such conversations.  Hinkle reported that he had seen Seal at a family function on October 31, had expressed his regret at what happened and wished Seal the best, but had said nothing more because of the ongoing criminal investigation.  Groseclose asked Hinkle if any family members had asked his advice about what Seal should do.  Hinkle responded "Nope."  Groseclose informed Hinkle there was an accusation that Hinkle had given advice to Seal, referring to a letter dated November 12 which had been sent to Douglas County Prosecutor Clem by a Deborah Guttman, a relative of Mary Linda Lee.  (Ex. P to Davis Declaration at Ct. Rec. 69).  In that letter, Guttman said it was her understanding that Seal "is indeed a relative of a law enforcement officer who maybe (sic) running for county Sheriff."  During his interview of Hinkle, Groseclose told Hinkle he could not recall the name of the woman who had sent the letter which was in the case file.  Groseclose stated that not until the letter had been received was the Sheriff's department aware of Hinkle being related to Seal. Groseclose informed Hinkle the reason for the interview was to make sure that if Hinkle knew anything about what happened and "any conversations with family members" trying to consult with Hinkle about the incident, that Hinkle would advise of that.  Hinkle's response was: "The family talks about it, but I don't discuss the case with them." Groseclose asked Hinkle if there was anything else important for the department to know, to which Hinkle responded "Just, um . . . the family is . . . sad about it."  Asked whether there was anybody in the family it would be important for Groseclose to speak to, Hinkle responded that he did not

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 5**

know.[3]

In January 2004, the Sheriff's department learned from an examination of the search warrants on the cell phone records of Seal and Jennifer Wiggs about the call Wiggs had placed to the Hinkle household on the evening of October 17, 2003.  Based on this information and because of the familial relationship between Seal and Hinkle, it was determined that a potential conflict of interest existed and a decision was made to turn the criminal investigation over to the Washington State Patrol (WSP).  On January 16, 2004, WSP agreed to conduct the investigation.

A Special Inquiry proceeding was convened on May 26, 2004.  Such a proceeding is authorized under Washington law whereby a prosecutor is permitted to examine potential witnesses under oath without counsel present.  It is a closed hearing designed to allow prosecutors, in conjunction with a criminal investigation, to elicit information from reluctant witnesses.  Chief Deputy Prosecutor Eric Biggar handled this proceeding.  Both Jennifer Wiggs and Hinkle testified during the proceeding.  Wiggs testified she called Hinkle on the evening of October 17, 2003 to solicit his advice as to whether her brother (Seal) should call the police about a domestic dispute in which he had been involved, but that Hinkle informed her he could not help.  Wiggs said she then immediately called her brother to inform him of this.  Hinkle testified that he told Wiggs "no" when she asked him for advice about what to do and he also testified that he first learned of the incident from his telephone conversation with Wiggs.

On June 4, 2004, Seal was charged by Information in Douglas County Superior Court with vehicular homicide.  An Affidavit of Probable Cause was signed by Groseclose on June 3, 2004, and presented to the court which, on June

---

[3]  A transcript of the November 13, 2003 interview of Hinkle by Groseclose is appended as Ex. J to the Davis Declaration, Ct. Rec. 68.

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 6**

7, 2004, issued a summons for Seal to appear on the charge.  (Exs. I, J and K to Mack Declaration, Ct. Rec. 42).  A jury acquitted Seal of the charge in November 2004.

On July 1, 2004, Sheriff LaRoche requested WSP to conduct an internal investigation of Hinkle to determine his involvement with the Seal criminal case. WSP agreed to conduct the investigation on July 21, 2004.  On February 7, 2005, WSP issued a report summarizing the results of its internal investigation.  No conclusions were offered, however, as to whether there had been any wrongdoing.

Upon receiving the report, LaRoche instructed Groseclose to prepare a summary and time line of the internal investigation up to that point.  (Ex. DD to Davis Declaration at Ct. Rec. 69).  Based on his review of Groseclose's summary and the evidence, LaRoche concluded that Hinkle had been dishonest and had failed to disclose information relevant to a pending criminal investigation. Following a "pre-disciplinary action meeting" on April 11, 2005 (*Loudermill* hearing) attended by Hinkle, LaRoche sent a letter to Hinkle dated April 27, 2005, terminating Hinkle from his employment with the Sheriff's department.  In his letter, LaRoche alleged that Hinkle had refused to admit his taped statement to Groseclose on November 13, 2003 was untruthful, and had failed to disclose knowledge of facts in his possession pertaining to an ongoing criminal investigation.

Hinkle grieved his discharge and an arbitration hearing was held in January 2006.  In June 2006, the arbitrator issued his opinion denying the grievance.

## III.  DISCUSSION

### A.  Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court.  *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469 (1975).  Under Fed. R.

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 7**

Civ. P. 56, a party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986); *Semegen v. Weidner*, 780 F.2d 727, 732 (9th Cir. 1985). Summary judgment is precluded if there exists a genuine dispute over a fact that might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248.

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986).

In ruling on a motion for summary judgment, all inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587. Nonetheless, summary judgment is required against a party who fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual disputes regarding other elements of the claim. *Celotex*, 477 U.S. at 322-23.

### B. Seal's Claims

In the Plaintiffs' complaint, it is alleged that "[t]he entire Seal criminal investigation was orchestrated by LaROCHE & CLEM in conspiracy with GROSECLOSE and the other defendants, for the sole purpose of obtaining evidence to be used by LaROCHE in his pursuit of the termination of HINKLE in violation of HINKLE'S constitutional rights under the 1st Amendment." (Paragraph 4.11 at Ct. Rec. 1 ).

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 8**

1. **Malicious Prosecution**

Seal alleges both a federal 42 U.S.C. Section 1983 malicious prosecution claim and a common law malicious prosecution claim under Washington state law.

Malicious prosecution with the intent to deprive a person of equal protection of the law or otherwise subjecting a person to a denial of constitutional rights is cognizable under Section 1983. *Poppell v. City of San Diego,* 149 F.3d 951, 961 (9th Cir. 1998) (*citing Usher v. City of Los Angeles*, 828 F.2d 556, 562 (9th Cir. 1987)). To establish a constitutional claim of malicious prosecution, a plaintiff must present evidence that he was prosecuted (1) with the purpose of denying him a specific constitutional right, and (2) with malice and without probable cause. *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995). Malicious prosecution actions are not limited to actions against the prosecutor. They may be brought against those persons who wrongfully caused the charges to be filed. *See Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126-27 (9th Cir. 2002).

Seal neither identifies or explains how a particular federal constitutional right of his was violated by virtue of his prosecution for vehicular homicide. Seal does not identify any evidence that he was prosecuted with the purpose of denying **him** of a specific constitutional right (i.e., prosecuted in retaliation for exercise of **his** First Amendment rights).[4] For this reason alone, summary judgment for the Defendants on Seal's Section 1983 malicious prosecution claim is warranted. For reasons discussed below, however, there is no genuine issue of material fact challenging the conclusion that there was probable cause to support Seal's

_____

[4] Although it is asserted that Seal was prosecuted for the improper purpose of obtaining evidence to terminate Hinkle in violation of Hinkle's federal constitutional rights (First Amendment), that does not provide Seal with a constitutional malicious prosecution claim. At best, it supports only a common law malicious prosecution claim.

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 9**

prosecution. As such, both the Section 1983 and the common law malicious prosecution claims fail as a matter of law.

The Washington Supreme Court has recognized five separate elements of the common law tort of civil malicious prosecution: (1) defendant initiated or continued the prosecution claimed to have been malicious; (2) the prosecution of the action lacked probable cause; (3) proceedings were instituted or continued through malice; (4) proceedings terminated on the merits in favor of the plaintiff or were abandoned; and (5) the plaintiff suffered injury or damage as a result of the prosecution. *Hanson v. City of Snohomish*, 121 Wn.2d 552, 558, 852 P.2d 295 (1993). Malice and want of probable cause constitute the gist of a malicious prosecution claim. *Id*.[5] Probable cause is a complete defense to a malicious prosecution claim. *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 499, 125 P.2d 681 (1942).

Seal was charged in an Information with one count of Vehicular Homicide. RCW 46.61.520(1)(b)(c) provides:

> When the death of any person ensues within three years as a proximate result of injury proximately caused by the driving of any vehicle by any person, the driver is guilty of vehicular homicide if the driver was operating a motor vehicle:
>
> . . .
>
> (b) In a reckless manner; **or**
>
> (c) With disregard for the safety of others.

(Emphasis added).

The Affidavit of Probable Cause which was prepared by Defendant Clem (Ex. JJ to Davis Declaration, Ct. Rec. 69, at pp. 46-47), and signed by Defendant Groselcose (Ex. J to the Mack Declaration at Ct. Rec. 42), includes the following recitation at Paragraph 5:

---

[5] "Malice" is a distinct element of a malicious prosecution claim. *See Peterson v. Littlejohn*, 56 Wn.App. 1, 10, 781 P.2d 1329 (1989).

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 10**

At the scene Deputy [Jon] Townsend spoke with Jeremy Lee, who was quite distraught.  Jeremy Lee explained that Randy McManus is the father of Ariel Lee and that McManus had unexpectedly arrived at the home located at 3030 Airway.  McManus picked up Ariel and began to leave the home.  Mary Lee told McManus that he could not leave with Ariel unless McManus spoke with Ariel's mother.  McManus stated that he had the right to take Ariel and quickly left while holding Ariel.  Jeremy stated that he and Mary Lee went after McManus.  Jeremy saw McManus running towards a pick-up truck parked down the street from the house.  **Jeremy reached the pick-up and grabbed McManus through the open passenger door.  The pick-up took off, pulling Jeremy until he could get his arm free.  When Jeremy got free he saw Mary Lee rolling on the ground from underneath the truck**.
. . . .

(Emphasis added).

Paragraph 7 of the Affidavit recites an interview that Sgt. Tom Couey had with McManus following the accident.[6]  McManus confirmed that when McManus sat in the pick-up truck after retrieving Ariel, "Jeremy reached the pick-up and the two men struggled as Jeremy tried to prevent McManus from leaving with Ariel." At this point, McManus told Jeff (Seal) to "Go, just go."  McManus stated he was able to finally push Jeremy away and shut the door after which Jeremy started beating on the window with a telephone that he was holding.

Paragraph 9 of the Affidavit discusses an interview of Seal by Deputy Jon Townsend later in the evening following the accident.  According to the affidavit: "Seal stated that he had not seen a woman and only had seen a very upset man." Paragraphs 10 and 12 of the Affidavit discuss an interview of Seal by Sgt. Dave Helvey.  In that interview, Seal told Helvey that McManus put his daughter in the pick-up and then McManus got in and told Seal to drive.  At that point, "[a]n adult male, unknown to Seal, reached in the pick-up and began struggling with McManus."  Seal "drove away" as this was happening.  Seal told Helvey that "he was looking where he was driving as he pulled away," "that he drove away

_____

[6] Due to a typographical error in the Affidavit, two Paragraph 7s appear at page 2 of the Affidavit.  The court refers to the second and lengthier Paragraph 7.

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 11**

slowly," "that he never saw a woman near his truck," and that "he did not hear or feel anything that would indicate he hit or ran over anything as he drove away." Seal also stated that he believed he was being interviewed by Helvey "**because the unknown man [Jeremy Lee] might claim being injured when Seal drove away**." (Emphasis added). Seal expressed "surprise and disbelief" when informed that Mary Lee had been struck by the pick-up and that she had died of her injuries.

Even assuming that Seal never saw Mary Linda Lee and did not know until later that his vehicle had struck her, as Seal claims, there was still adequate probable cause established by the affidavit to justify charging Seal with vehicular homicide.[7] The vehicular homicide statute does not require that Seal have seen Mary Lee around his vehicle and/or that he knew he struck her.[8] It was not necessary that Seal "disregarded" the safety of Mary Linda Lee specifically. The statute requires that the death of "any person" ensues as a proximate result of injury proximately caused by the driving of a vehicle if the driver was operating the vehicle in a reckless manner or with disregard for the safety of "others." The Affidavit of Probable Cause unequivocally established probable cause that the death of Mary Linda Lee was caused by Seal's driving of his pick-up truck in

---

[7] It is noted that Seal was not charged with hit and run which would have required knowledge on his part that he had struck an individual with his pick-up. RCW 46.52.020.

[8] In December 2003, the Sheriff's office staged a re-enactment of the accident in an effort to determine whether Seal would have seen Mary Linda Lee standing in front of his truck at the time he struck her. The results of this "re-creation" are set forth in the Affidavit of Probable Cause at Paragraph 17. At his deposition, Groseclose conceded the lighting conditions and the clothing of the re-enactment "victim" were not the same. (Groseclose Dep. at pp. 214-15, Davis Supplemental Declaration at Ct. Rec. 74).

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 12**

either a reckless manner **<u>or</u>** with disregard for the safety of another, specifically Jeremy Lee who was reaching into the window of the pick-up and struggling with McManus as Seal drove away.  Indeed, during his deposition, Groseclose denied there was no evidence to prove vehicular homicide because Seal was "dragging somebody in his . . . passenger side door, which is endangering him [Jeremy Lee] . . . and in the process, he runs over and kills [Mary Lee] ."  (Groseclose Dep. at pp. 122-23, Ex. B to Davis Declaration, Ct. Rec. 68).

As noted, recklessness and "disregard for the safety of others," are separate and distinct standards.  "Disregard for the safety of others" is an aggravated kind of negligence falling short of recklessness, but constituting a more serious dereliction than the hundreds of minor oversights and inadvertences encompassed within the term negligence.  *State v. Lopez*, 93 Wn.App. 619, 623, 970 P.2d 765 (1999).  Driving in a reckless manner means "to drive in a rash or heedless manner, with indifference to the consequences."  *State v. Thompson*, 90 Wn.App. 41, 48, 950 P.2d 977 (1998).[9]  Not only did the Affidavit of Probable Cause establish probable cause for charging Seal with vehicular homicide on the basis of "disregard for the safety of others," it also established probable cause for charging him with that offense on the basis of driving in a "reckless manner."  In addition to the aforementioned paragraphs of the affidavit, Paragraph 15 recites that Groseclose interviewed certain neighbors of Mary Linda Lee who heard "screaming and tires squealing," "a thud and tires squealing," and "a dull thud and then a vehicle go by 'at kind of a fast rate of speed.'"  Plaintiffs' counsel alleges these witnesses were "coached," but no evidence has been cited in support of that

---

[9]  Characterizing the incident as a "tragic accident" is not inconsistent with charging the incident as a vehicular homicide.  Vehicular homicide is an "unintentional" killing.

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 13**

allegation.[10]

There is no genuine issue of material fact that there was probable cause to charge Seal with vehicular homicide. As such, it is not necessary to discuss prosecutorial immunity. Alternatively, however, this court would find that Defendant Clem is entitled to prosecutorial immunity and that this immunizes the Defendant officers who were responsible for investigating the case (i.e., Groseclose and Helvey).

Prosecutors are absolutely immune from liability under §1983 for initiating and presenting the State's case insofar as that conduct is intimately associated with the judicial phase of the criminal process. *Imbler v. Pachtman*, 424 U.S. 409, 430-31, 96 S.Ct. 984 (1976). Washington courts follow federal constructs of such immunity in cases involving state tort law claims, including malicious prosecution. "Analysis of a prosecutor's absolute immunity from suit under state law claims tracks common law immunity analysis under 42 U.S.C. §1983." *Musso-Escude v. Edwards*, 101 Wn.App. 560, 567-68, 4 P.3d 151 (2000). In the Ninth Circuit, there is a presumption that a prosecutor exercises independent judgment in determining whether there is probable cause on which to file criminal charges. *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988); *Smiddy v. Varney*

---

[10]  Paragraph 16 of the Affidavit set forth the cell phone calls that had been made by Seal and Jennifer Wiggs on the evening of October 17, 2003, following the accident. It appears the purpose of this was to show that Seal knew he had been involved in some kind of accident, and/or that he had knowledge that he had struck Mary Linda Lee, and/or may have learned shortly after the fact that he had struck Lee. To the extent Paragraph 16 is intended to show that Seal knew he had struck Mary Linda Lee, like Paragraph 17 discussed in footnote 8 *supra*, it was not critical in establishing probable cause to charge Seal with vehicular homicide because that charge did not depend on Seal knowing that he had in fact struck Lee.

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 14**

*("Smiddy I")*, 665 F.2d 261, 266 (9th Cir. 1981).  Filing of a criminal complaint immunizes investigating officers from damages suffered thereafter because it is presumed the prosecutor filing the complaint exercised independent judgment in determining that probable cause existed at that time.  The presumption may be rebutted by a showing that the prosecutor was pressured or caused by the investigating officers to act contrary to his independent judgment.  It may also be rebutted where there is evidence that the investigating officers knowingly presented false information to the prosecutor.  *Smiddy I*, 665 F.2d at 266-67.

The court finds as a matter of law that Defendant Clem's conduct in initiating and presenting the State's case was intimately associated with the judicial phase of the criminal process.   Furthermore, the court finds there is no evidence raising a genuine issue of material fact that Defendant Clem was pressured or caused by investigating officers to act contrary to his independent judgment, or that investigating officers knowingly presented false information to Clem.  As a matter of law then, the court finds that Clem exercised independent judgment in determining that probable cause existed to charge Seal with vehicular homicide.  Accordingly, Defendant Clem is entitled to prosecutorial immunity and the investigating officers are immunized by Clem's filing of the vehicular homicide charge against Seal.

Seal alleges many other causes of action, but they all arise out of his core allegation that he was improperly prosecuted.  In other words, the same facts support all of these causes of action.  Plaintiffs' counsel acknowledged as much during oral argument.  Accordingly, because the court is granting summary judgment on the malicious prosecution claims, it must grant summary judgment on

///

///

///

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 15**

Mr. Seal's other claims (police and prosecutorial misconduct, false arrest[11], negligence[12], fraud, abuse of process, intentional infliction of emotional distress, negligent infliction of emotional distress, defamation, etc.).

## C. Hinkle's Claims

### 1. First Amendment Retaliation Claim

The fact that Seal was not maliciously prosecuted makes it impossible for Hinkle to claim the investigation and prosecution of Seal was for no purpose other than to develop evidence for terminating Hinkle from his employment. In other words, Seal's prosecution is not evidence that Hinkle was terminated from employment for engaging in constitutionally protected conduct (opposing the Sheriff in an election).

In *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568 (1977), the Supreme Court developed a three-part test for determining whether an employee has been terminated in retaliation for the exercise of First Amendment

---

[11] In Plaintiffs' "Memorandum of Authorities," it is acknowledged that "Jeff Seal, was not arrested." (Ct. Rec. 70 at p. 4). During his deposition, Seal also admitted he was not arrested. (Ex. B to Mack Declaration, Ct. Rec. 42, at pp. 63 and 68). In any event, the probable cause which supported Seal's prosecution for vehicular homicide, specifically the interviews of McManus, Lee and Seal on the evening following the accident, established probable cause for any "arrest" of him which occurred on that evening. Probable cause is a complete defense to claims of malicious prosecution, false arrest, and false imprisonment. *Fondren v. Klickitat County*, 79 Wn.App. 850, 856, 905 P.2d 928 (1995).

[12] No Washington court has ever recognized a separate and distinct cause of action for negligent investigation. *Dever v. Fowler*, 63 Wn.App. 35, 44, 816 P.2d 1237 (1991).

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 16**

rights.  First, the plaintiff must show that the relevant conduct was constitutionally protected.  Secondly, the plaintiff must show the conduct was a "substantial" or "motivating" factor in the decision to terminate.  If the plaintiff meets this burden, the defendant must then show by a preponderance of the evidence that the same decision as to the plaintiff's employment would have been reached even in the absence of the protected conduct.

The mere fact that Hinkle ran against LaRoche in the 2002 election does not give rise to a reasonable inference that Hinkle was terminated in retaliation for that political activity.  Hinkle does not dispute that at least two other deputies who ran against LaRoche in previous campaigns continued to work for the Douglas County Sheriff's Department until their retirements.  (LaRoche Dep. at pp. 36 and 38, Ex. F to Mack Declaration, Ct. Rec. 42).

The undisputed facts make it clear there was a reasonable and legitimate basis for concluding that Hinkle had been dishonest in the answers he gave to Groseclose during the November 2003 interview.  Groseclose asked Hinkle if any family members had asked his advice about what Seal should do.  Hinkle responded "nope," although Wiggs later testified during the May 2004 Special Inquiry Hearing that is precisely what she did on the evening of October 17, 2003 when she called the Hinkle residence and advised that her brother (Seal) had been involved in some kind of domestic/custody dispute.  Just minutes prior to that, Hinkle had been advised by the Sheriff's dispatcher that there had been a custodial interference incident in which a woman had been run over by a vehicle.  Hinkle offers no evidence that at the time of his November 2003 interview with Groseclose, that Groseclose knew of the call that Wiggs had made to the Hinkle residence on October 17, 2003.  The undisputed evidence is that the Sheriff's department, including Groseclose, did not know about this call until January 2004. It is also undisputed that Groseclose did not know until December 2004, during the course of the WSP internal investigation of Hinkle, that on the morning of

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 17**

October 18, 2003, Hinkle had accessed the file regarding the incident in which Mary Linda Lee had been struck by a vehicle.  LaRoche had a reasonable and legitimate basis for concluding that Hinkle knew exactly why Wiggs had called him (Hinkle) on October 17, 2003, considering the conversation that Hinkle had with the dispatcher just minutes before the call from Wiggs, and the fact that on the very next day (October 18), Hinkle accessed the file concerning the "custodial interference" incident.  La Roche had a reasonable and legitimate basis for concluding that Hinkle knew or should have known that Groseclose was asking him about contacts he had with family members and that Hinkle wilfully answered dishonestly or otherwise withheld information he knew Groseclose wanted to know about.

Hinkle has not submitted sufficient evidence giving rise to a reasonable inference that LaRoche terminated Hinkle in retaliation for Hinkle running against LaRoche in the 2002 election.  All of the evidence submitted by Hinkle, and from which he asks that inferences be drawn that he was retaliated against, do not change the fundamental fact that it was reasonable and legitimate for LaRoche to conclude that Hinkle was not honest in answering Groseclose's questions.

Hinkle alleges that his November 13, 2003 interview by Groseclose was essentially a "set up" in that the Sheriff's department was already looking for a reason to terminate him.  Hinkle says he was effectively under investigation at that time, both as an internal matter and as a criminal matter, and should have been advised of the same and afforded proper due process protections.  Thus, Hinkle notes that it was not until January 14, 2004 that LaRoche requested the assistance of WSP with the Seal investigation "due to one of our employees being indirectly related to the suspect."  He notes that the Douglas County Sheriff's Department had known since "a day or two" after the October 17, 2003 accident that Hinkle was indirectly related to Seal, at least that Defendant Wagg, according to his deposition testimony, had such knowledge.  (Ex. C to Davis Declaration, Ct. Rec.

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 18**

68, at p. 44), and that the Sheriff's department had known of the phone calls between Seal and Wiggs prior to the November 2003 Groseclose interview. The fact that LaRoche did not ask for WSP assistance in the Seal criminal investigation until January 14, 2004 is not surprising, however, considering it was not until January 12, 2004 that LaRoche learned for the first time that Wiggs had also placed a call to the Hinkle residence.

In his opinion, the arbitrator concluded that even though statements made by Hinkle to Groseclose during the November 2003 interview were used as evidence as dishonesty, "Deputy Hinkle was not himself being investigated at this time and thus was not entitled" to due process protections. The arbitrator noted that these protections were provided once the internal investigation was initiated by WSP. (Ex. M. to Mack Declaration, Ct. Rec. 42, at pp. 67-68). The evidence supports the arbitrator's conclusion. Prior to the interview, the Sheriff's department and the Prosecutor's office had been receiving communications from Mary Linda Lee's family making accusations there was a cover up because of the fact Seal was related to Hinkle. The interview was conducted to ascertain whether Hinkle had any involvement and Groseclose specifically advised Hinkle of the allegations by the family and explained that was the reason the Sheriff's department wanted to make sure there was no such involvement. Groseclose did not interview Hinkle simply "out of the blue." Furthermore, all that Groseclose knew at the time of the interview was that Hinkle was indirectly related to Seal through Seal's sister, Jennifer Wiggs, and that Seal had made telephone calls to Wiggs on the evening of October 17, 2003. Groseclose was also aware of an allegation by Ariel Lee that she had gone to a "Joe's house" on the evening of October 17, 2003, an allegation he testified he did not believe was credible at that time. (Groseclose Dep. at pp. 94-95, Davis Second Supplemental Declaration at Ct. Rec. 78). As Hinkle notes, the allegation surfaced again during WSP's internal investigation of Hinkle which began in July 2004, and during Hinkle's

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 19**

1   disciplinary hearings which followed thereafter.  It must also be noted, however,

2   that by July 2004, it was known for a fact that Wiggs had made a telephone call to

3   the Hinkle residence on the evening of October 17, 2003, and had spoken with Joe

4   Hinkle.  Furthermore, it was not until June 2004 that Groseclose learned of the call

5   Hinkle had made to dispatch on the evening of October 17, 2003 (Ex. M to Mack

6   Declaration, Ct. Rec. 42, at p. 16), and it was not until December 2004 that

7   Groseclose learned that Hinkle, on October 18, 2003, had accessed the case file

8   regarding the October 17 incident.  (*Id*. at p. 9).[13]

9       Hinkle contends the fact he received three written reprimands prior to his

10   termination shows a pattern of the Sheriff's department trying to get rid of him

11   because of his candidacy for the Sheriff's position in 2002.  These reprimands date

12   from April 2002, August 2003, and February 2004 respectively.  (Ex. M to Mack

13   Declaration, Ct. Rec. 42, at p. 29).  Hinkle contends the reprimands were not

14   justified, The record indicates that although Hinkle grieved the first two

15   reprimands, he did not pursue them to arbitration.  Furthermore, Hinkle did not

16   grieve the third reprimand, but reimbursed the county for unauthorized phone

17   calls.  (*Id*. at footnote 21).  This court will not re-examine the validity of these

18   reprimands, nor is there any need to do so, because their validity does not change

19

20       [13] Groseclose's incident report does not indicate otherwise.  In that report at
21   p. 29, Groseclose states that Hinkle told him during the November 13, 2003
22   interview that he (Hinkle) "had read Sergeant Helvey's report on the incident."
23   Detective Helvey's initial report is dated **October 19, 2003** (Ex. N to Davis
     Declaration, Ct. Rec. 69, at pp. 41-45) and therefore, would not have been
24   available for review on October 18.  During oral argument, Plaintiffs' counsel
25   acknowledged that all Hinkle would have been able to access on October 18 was a
26   report from Deputy Townsend and perhaps a report from Deputy Couey.
     Furthermore, what is critical is not necessarily the amount of information
27   contained in the file at the time Hinkle accessed it, but the mere fact he accessed it
28   and did not acknowledge doing so until December 2004.

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 20**

the answers given by Hinkle to the questions asked of him by Groseclose during the November 13, 2003 interview. The arbitrator arrived at the same conclusion, finding that although the reprimands were not "particularly serious," he was forced to "conclude that the County proved wilful misconduct on Deputy Hinkle's part based on dishonesty and withholding of information pertinent to an ongoing criminal investigation [the Seal investigation]." (*Id*. at p. 68). Hinkle was not terminated for giving advice to Jennifer Wiggs to relay to her brother. There is no evidence in the record he gave such advice. He was terminated because he did not reveal his conversation with Wiggs to Groseclose during the November 13, 2003 interview.

There are no genuine issue of material fact precluding this court from finding as a matter of law that Hinkle's political activity- running against LaRoche in the 2002 election- was not a "substantial" or "motivating" factor in LaRoche's decision to terminate Hinkle.

Hinkle alleges many other causes of action, but they all arise out of his core allegation that he was retaliated against for exercising his First Amendment rights. In other words, the same facts support all of these other causes of action. As such, because summary judgment for Defendants is awarded on the retaliation claim, it must also be awarded on all of the other causes of action (abuse of process, intentional infliction of emotional distress, negligent infliction of emotional distress, defamation[14], discrimination under the Washington Law Against

---

[14] Hinkle does not identify a single specific factual statement by any Defendant which he claims to be defamatory, let alone offer any legal analysis as to why it would be defamatory. The Declaration of Sharon Seal (Ex. II to Davis Declaration at Ct. Rec. 69) does not remedy this deficiency and is improper evidence because it is hearsay and personal opinion.

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 21**

1   Discrimination (WLAD), RCW 49.60.030[15], and for wrongful discharge in

2   violation of public policy[16]).

3

4   **IV. CONCLUSION**

5          Defendants have met their initial burden of proving that no genuine issue of

6   material fact exists and the Plaintiffs have failed to designate specific facts

7   establishing a genuine issue for trial.  Accordingly, Defendants' Motion For

8   Summary Judgment (Ct. Rec. 38) is **GRANTED**.  All Defendants are awarded

9   judgment on all claims asserted against them by all Plaintiffs.

10         **IT IS SO ORDERED.**  The District Court Executive is directed to file this

11  Order, enter Judgment accordingly, provide copies of the same to counsel, and

12  close the file.

13         **DATED** this _____10th_____ day of October, 2008.

14                                              *s/Lonny R. Suko*

15                                    _____
                                      LONNY R. SUKO

16                                    UNITED STATES DISTRICT JUDGE

17  _____

18         [15] Hinkle cites no cases holding that termination for political activity gives

19  rise to a claim under the WLAD.  Retaliatory discharge is actionable under
    WLAD, provided an individual can demonstrate that he opposed practices

20  prohibited under WLAD or assisted with an anti-discrimination proceeding
    brought under WLAD.  *Galbraith v. TAPCO Credit Union*, 88 Wn.App. 939, 952,

21  946 P.2d 1242 (1997).  Discrimination prohibited by WLAD includes race, creed,

22  color, national origin, sex, honorably discharged veteran or military status, sexual

23  orientation, or disability.  RCW 49.60.030(1).  "Political activity" does not

24  constitute a protected class.

25         [16]  Hinkle does not respond to Defendants' assertion that since Hinkle's

26  discharge was upheld by the arbitrator, that precludes a suit for wrongful discharge
    in violation of public policy.  More fundamentally, however, if there was no

27  retaliation in violation of Hinkle's First Amendment rights, no public policy is

28  offended by Hinkle's discharge.

**ORDER GRANTING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT - 22**